T. H. Riddell v. Commissioner.
Riddell v. Comm'r
Docket No. 46385. United States Tax Court
T.C. Memo 1956-74; 1956 Tax Ct. Memo LEXIS 221; 15 T.C.M. (CCH) 379; T.C.M. (RIA) 56074; March 27, 1956
L. Lamar Beacham, Esq., Plaza Building, Jackson, Miss., and Rufus Creekmore, Esq., for the petitioner. D. Louis Bergeron, Esq., and R. B. Wallace, Esq., for the respondent. JOHNSON Memorandum Findings of Fact and Opinion JOHNSON, Judge: This proceeding *222 involves deficiencies in income tax and penalties as follows: Penalties
Sec. 294
Sec. 294
Year
Deficiency
Sec. 293(b)
(d)(1)(A)
(d)(2)
1941
$ 4,548.93
$ 2,274.47
1942
7,611.81
3,805.91
1943
19.49
9.75
$ 1.95
$ 1.17
1944
565.83
282.92
56.58
33.94
1945
23,755.97
11,877.99
2,375.60
1,425.36
1946
23,632.46
11,816.23
2,363.25
1,417.95
1947
5,410.19
2,705.10
541.02
324.61
1948
27,309.71
13,654.86
2,730.97
1,638.58
The issues in general are whether respondent correctly determined petitioner's taxable income for each of the taxable years, and whether the penalties determined in the notice of deficiency were proper. Respondent, by an amended answer, claimed increased deficiencies to reflect adjustments of net income as determined by him, and for 25 per cent penalties in 1943 and 1945 under section 291(a), I.R.C. of 1939, for failure to file proper returns for those years. Petitioner alleged that assessment of the deficiencies is barred by the statute of limitations. Findings of Fact The stipulation of facts is incorporated herein by reference as part of our findings of fact. Petitioner *223 was, at all times material, a resident of Canton, Mississippi. He filed his returns for the taxable years with the collector of internal revenue for the district of Mississippi. Petitioner was married during the taxable years, during which he was the chief support of his parents, who had no separate income, and three minor children. Petitioner's wife filed separate income tax returns for the years involved herein and paid the tax due thereon. Petitioner completed a course in pharmacy at the University of Mississippi in 1921 and thereafter, for about 2 years, played professional baseball. He owned and operated a drug store in Canton from 1923 until 1925, when he was declared a bankrupt. Thereafter, until 1938, he operated a small farm and a sawmill, did trucking, and bought and sold livestock. Since 1938 petitioner, among other things, has operated livestock and commission barns in Mississippi under the name of Tom Riddell Community Sales, except the one located in Cleveland, which was operated under the name of Bolivar County Stockyards, the period of operation of each of which was as follows: From
To
Location
1938
Feb. 1945
Canton
Sept. 1940
Present
Jackson
Sept. 1942
June 1945
Pickens
June 1943
Oct. 1943
East Jackson
April 1944
Feb. 1945
Cleveland
*224 He also was an equal partner during and after 1937 in the operation of a cotton gin in Canton under the name of Ballard Gin Company. Petitioner acquired his interest in the business in 1937 at a cost of $4,175. During the taxable years petitioner was engaged at times in the following other business activities: Farming, including the growing of cotton with sharecroppers and tenant farmers. Purchase and sale of cattle, horses, and mules. Hauling. Some of the activities of petitioner were carried on in association with others under the following names: Riddell & Greaves, Riddell and Hart, T. H. Riddell & Sons Excepting accounting matters, petitioner transacted or supervised the conduct of his business activities, in connection with which he generally worked long hours every day, and spent part or all of several days each week traveling on business matters. The only book kept by petitioner for his farming operations was a single entry book in which he recorded advances made to each tenant. Checks in payment of farming expenses were generally drawn against petitioner's personal bank account. Most of such checks bore notations of the purpose for which they were issued. *225 Prior to April 1943 the books kept for the barn in Jackson consisted of a ledger in which was recorded the total amount for which stock was sold and the amount of commission charged for conducting the sales. He also maintained a "feed" ledger and a "loss" ledger. The books were inadequate for income tax purposes. During that period petitioner had no competent employee to keep his records and he was not at any time qualified to maintain a set of books of account. In April 1943 petitioner engaged Mildred Patton, hereinafter referred to as Patton, who for 9 years prior thereto had been an office deputy clerk in the office of the collector of internal revenue in Jackson, Mississippi, to open an adequate set of books for his business, take charge of his office, and do his bookkeeping. The books which she opened for that purpose consisted of a cash book, check register, and general, control, accounts payable, and accounts receivable ledgers to record transactions conducted at the barn in Jackson. Patton continued in the employ of petitioner until the close of 1946 when she was succeeded by Louis Sutherland. Before taking up his duties in 1946, Sutherland requested that the books be *226 "audited." Thereafter Paul Jorgensen, a public accountant, did posting in the books at the Jackson office one or more times a month and balanced the books at the end of the month. He was never able to make an audit of the books and records of petitioner because the only ones available to him were those pertaining to the barn at Jackson. Petitioner purchased livestock in Mississippi and in the southwest and midwest for sale at his auction barns. He generally served as ringmaster at his auctions and while acting in that capacity, and in accordance with custom, he started the bidding under a fictitious name. The stock was at times sold to him at his starting price and resold at a subsequent sale. These trading operations of petitioner at the barn in Jackson were reflected in a "trading account". Amounts not incurred in trading were frequently charged to the account, including amounts withdrawn from a barn checking account to reimburse a withdrawal from petitioner's personal bank account in Canton to purchase cattle, and as a result a double charge for one purchase would be made in the account. At times the amount of a check was charged to the account and also to the withdrawal account *227 of petitioner. The erroneous manner in which the trading account was being kept was called to petitioner's attention by Jorgensen, but it does not appear that anything was done to correct the faulty accounting practice. The deposits and withdrawals in checking accounts used by petitioner during the taxable years were as follows, cents omitted: Pickens Bank, Pickens, Miss.[1]
Year
Deposits
Withdrawals
1943
$ 216,165
$ 218,266
1944
272,804
274,736
1945
114,785
113,247
1946
926
First National Bank, Canton Miss.
Riddell & Greaves Sale [2]
Year
Deposits
Withdrawals
1941
$ 213,253
$ 209,259
1942
54,137
58,363
1943
12
491
Riddell & Hart [3]
Year
Deposits
Withdrawals
1943
$ 732
$ 60
1944
1,186
739
1945
1,850
2,969
*228 T. H. Riddell & Son [4]
Year
Deposits
Withdrawals
1948
$ 8,998
$ 8,834
T. H. Riddell [5]
Year
Deposits
Withdrawals
1941
$ 108,197
$ 108,384
1942
151,184
153,899
1943
129,432
122,953
1944
89,016
90,270
1945
83,220
80,116
1946
120,324
125,165
1947
125,485
121,676
1948
154,782
149,293
Commercial Bank & Trust Co., Jackson
Riddell & Greaves Community Sales [6]
Year
Deposits
Withdrawals
1941
$ 460,671
$ 459,795
1942
872,738
855,281
1943
1,175,500
1,193,917
1944
1,180,062
1,180,065
1945
1,642,655
1,642,636
1946
1,935,957
1,915,555
1947
2,790,261
2,810,682
1948
2,826,917
2,810,479
*229 Petitioner frequently borrowed money for deposit in a bank account and withdrew money from one bank account to cover an overdraft in another bank account. From 1937 to the close of 1948 petitioner purchased farming land, made improvements thereon, and made sales thereof as follows: Cost
Year
Acres
Farms
Improvements
Sales [1]
1937
635
$13,820.50
1938
$ 1,100.00
1939
360
3,600.00
1,600.00
$ 2,611.68
1940
6,964.66
1941
3,770.00
1942
2,500.00
1943
215
10,750.00
1944
378
14,900.00
920.58
1945
495
6,063.67
15,182.33
1946
1,677
20,750.30
21,850.00
1947
2,172.85
1948
2,622.40
Total
$69,884.47
$35,615.25
$25,679.25
The sales made in 1944 and 1945 were not reported in the income tax returns filed by petitioner for those years. One of the farms, known as Rick's Place, consisting of about 1,676 acres, was purchased in 1945 for $54,474.96, of which $12,974.66 was paid in 1945 for 495 acres, and $38,396.83 in May 1946. Included in the purchase were farm equipment, cows, farm products, seed, and accounts receivable. *230 The improvements on the farm included an old 13-room house, 18 tenant houses, a large barn, and other buildings for the operation of the property. Of the total purchase price $16,078.13 was paid by three checks drawn against petitioner's personal bank account in the First National Bank in Canton, 2 of which were issued in 1945 for a total of $12,974.66. Another of the farms, consisting of 298 acres, was purchased in November 1944 for $11,500, which was paid for in currency. The property was sold in 1945 with no gain. The sale was not reported in petitioner's return for 1945. The proceeds of sale were deposited in a bank account of petitioner. The farms purchased by petitioner also included a 215-acre tract of improved land known as the Barnett tract, which, with an account receivable in the amount of $1,100 owed by the tenant on the farm, was acquired on April 26, 1943, for $10,750. Of the total purchase price respondent allocated $500 to a tenant house, $150 to a barn, and no amount to accounts receivable held by petitioner at the close of 1943. Petitioner did not file individual income tax returns for the years 1931 to 1936, inclusive. He filed individual income tax returns *231 for the years 1937 to 1940, inclusive, disclosing no tax liability. Like returns filed by the petitioner for the taxable years disclosed gross income, deductions, and losses as follows, cents omitted: Year
Income
Deductions
Losses
1941
$ 20,970
$ 21,914
$ 944
1942
63,305
66,036
2,730
1943
58,887
72,902
14,015
1944
50,220
74,416
24,196
1945
75,924
80,387
4,463
1946
103,438
115,745
12,306
1947
100,459
127,927
27,468
1948
121,905
146,890
24,985
Deductions claimed in the returns for depreciation were based upon cost as follows, cents omitted: Year
Cost
Depreciation
1941
$ 2,715
$ 646
1942
46,297
5,410
1943
49,670
5,844
1944
59,711
6,516
1945
[1]1
7,326
1946
146,676
18,107
1947
186,423
17,960
1948
[2]
20,917
The return filed by petitioner for 1941 was prepared by an attorney from records submitted to him *232 by petitioner, including checks and bank statements. The return listed $563.31 as petitioner's receipts from the operation of the barn at Canton. The attorney was not an accountant. The attorney concluded at that time that petitioner did not "keep any records to amount to anything." The returns filed by petitioner for 1942, 1943, 1944, 1945, and 1946 were prepared by Patton. The 1942 return was prepared at the request of the petitioner while she was employed in the collector's office. Patton prepared the return from such records as petitioner had, including checks and invoices. The returns for other years were prepared from such books and records as were available to her at the Jackson barn. Petitioner never withheld from her any information she expressed a desire to have in the preparation of his returns. Patton informed him each year that the return showed no tax liability to which he responded by saying that "I thought I was making money". She had no knowledge of petitioner's purchases of land. Petitioner did not examine any of the returns before he signed them. The returns for 1942, 1943, 1944, and 1945 reported no income from the operation of the barn in Canton. The return for *233 1945 reported no gross income from the operation of the barn at Pickens. Except for the return for 1946, Patton did not disclose on the returns that they had been prepared by her. She certified on the 1946 return that it had been "prepared from figures furnished by taxpayer." Her failure to make the certificate on the 1942 and 1943 returns was due to oversight. Petitioner was in a distant city at the time the returns for 1943 and 1945 were ready for filing and requested Patton by telephone to sign his name to them, which she did. The returns filed by petitioner for 1947 and 1948 were prepared by Jorgensen from information supplied by petitioner without verification. There was no means of verifying a major portion of the figures supplied for 1947. The data was furnished by petitioner a few days before the statutory filing date for each return and included a box of checks, the farm tenants' book, information about his cotton gin, incomplete bank statements, trial balances of the general ledger kept for the business conducted at the Jackson barn, and a list of oil companies from which to obtain the amount of royalty payments made to him. Jorgensen had no knowledge of all of the *234 banks petitioner used to transact business. The only source of information available to him for verifying gross income from farming operations was cotton settlement sheets. He was informed by petitioner that other crops grown on the farms were for feed for stock on the farms. The personal bank account of petitioner was not made available to Jorgensen for reconciliation of deposits. Jorgensen was unable to obtain the attention of petitioner for more than about two hours for the preparation of each return. Jorgensen was advised by petitioner that he had no other data from which to prepare his return. Most of the checks, including checks on the personal account, contained a notation of the purpose for which they were issued. Jorgensen did not know whether all of the personal checks were delivered to him. Data for computing depreciation was obtained from the 1946 return, the Jackson barn books, and checks. Jorgensen endeavored without avail to persuade petitioner to have sufficient books and records kept for the preparation of adequate returns. Petitioner's books and records were not adequate to clearly reflect his income for any of the taxable years. In July 1950 a special agent and *235 a revenue agent began an investigation of the returns filed by petitioner for the taxable years. They ascertained that petitioner had books and records to reflect his business activities at the Jackson barn for the years 1947 and 1948 and some books and records for that part of his business for the years 1943, 1945, and 1946. He submitted no records at that time for his farming operations. Petitioner maintained no record of his receipts from oil royalties or oil leasing activities, or cotton sales, or gross receipts from farming activities. The only books petitioner kept for his farming activities was a book in which he listed advances made to tenants. The investigating agents found that the accounts receivable account in the books kept for the Jackson barn had a credit balance of $38,894.18 at the close of 1945. The account had a credit balance at the close of each month in 1946, the balance having been $42,859.13 on January 31 and $54,767.95 on May 31. The balances in the account at the close of 1947 and 1948 were $9,921.46 and $24,551.04, respectively. Petitioner had no records from which the investigating agents could determine the amount of cotton grown and sold by petitioner *236 during the taxable years. Petitioner advised respondent's agents to consult S. W. Latimer, the purchaser of his cotton, on the subject. Later, when the agents found a shortage of about 100 bales of cotton in 1948, petitioner told them that he also made sales to another individual, who was deceased. Petitioner denied to the investigating agents that he had cattle and a tract of land on lease, known as the Cottonwood Plantation until he was informed by them that they had knowledge of his ownership of the property. He first said that the 308 head of cattle he had on the plantation had a value of $70 a head and had been purchased out of the proceeds of a loan of $20,000. Later, he informed them that he purchased only one-half of the stock, and then, under oath, said that he purchased only 10 per cent of the cattle and raised the remainder of them on his farm. Petitioner used the plantation in 1947 and 1948 for grazing cattle. The plantation was leased to the petitioner on July 27, 1947. The cattle grazed by petitioner on the plantation were sold at his Jackson barn. Petitioner never maintained an inventory of his cattle. At the close of 1947 petitioner had cattle which he had acquired *237 during that year at a cost of $21,169.66. He had no inventory of cattle at the close of 1948. Applications filed by petitioner for loans listed the following as to ownership of cattle, and his net worth, cents omitted: Date of
Number of
Application
Head
Value
Net Worth
Mar. 14, 1941
94
$ 4,145
$ 30,920
Mar. 15, 1944
225
18,955
75,975
May 1, 1946
35,000
210,756
June 7, 1946
196
19,000
250,500
Mar. 31, 1947
394
33,900
292,270
Sept. 9, 1947
400
30,000
331,160
Jan. 16, 1948
547
45,290
295,910
Most of the withdrawals made by petitioner from his business at Jackson during 1946, 1947, and 1948 were charged to his trading account and some others were charged to hauling and road expense. The charges to the latter account in 1947 totaled $3,500. Petitioner had no books from which the cost of his farming machinery could be determined. Petitioner bought and sold farming equipment at various times without making a record of the transactions. He paid cash for $1,500 of church bonds. The personal and nondeductible expenses of petitioner for the years 1941 to 1945, inclusive, were estimated by the respondent in the absence *238 of cancelled checks or other records to establish the amounts. Checks issued by petitioner against his personal bank account always bore a notation of the purpose for which they were drawn. Checks signed by his wife against the account did not contain such a notation. Respondent determined from cancelled checks drawn against petitioner's personal bank account, most of which were signed by the latter's wife, that petitioner's personal and living expenses were $9,018.16 in 1946, $9,782.98 in 1947, and $14,159.65 in 1948. The total so determined each year includes the following amounts: 1946
1947
1948
C. & C. Grocery [1]
$235.59
$102.94
$ 102.03
Murphy Tours [2]
303.30
Chickens
50.80
Clothing and depart-
ment stores: Porlinsky [3]
215.19
Other stores
533.20
Murphy Tour and fish-
ing trip [4]
579.00
Flowers [5]
81.52
Football tickets [6]
1,055.85
Donations [7]
288.00
*239 Respondent ascertained the cost of automobiles from petitioner's returns for 1940, 1941, and 1942, and from dealers from whom the cars were purchased. The automobiles were driven about 65,000 miles a year in connection with petitioner's business activities. He generally traded them in for new cars at the end of about 2 years of use. Petitioner claimed deductions in his returns for 1941, 1942, 1943, and 1944 for depreciation on the automobiles based upon a useful life of 3 years. No depreciation schedule was attached to the return for 1945 but exhaustion of $700 was claimed on a Chrysler at the rate of 3 1/2 cents a mile for 20,000 miles of operation. Depreciation for 1947 was claimed at the rate of 20 per cent per annum. In determining the deficiencies for the taxable years, respondent depreciated the assets, including a Dodge, acquired on April 18, 1947, and sold by petitioner during the latter part of 1948, on the basis of a useful life of 5 years. A reasonable allowance for exhaustion of the automobiles is at the rate of 25 per cent a year. Respondent ascertained the cost of trucks and trailers, used extensively by petitioner in his business to haul livestock and feed, partly *240 from his records and the other part from records of dealers from whom they were purchased. Some of the equipment was used by petitioner for as long as 5 years. Petitioner claimed in returns for 1941, 1942, 1943, 1944, 1946 and 1947, and respondent allowed for each taxable year involved herein, depreciation on the trucks over a life of 4 years and on the trailers at the rate of 20 per cent a year. [1]
Petitioner rendered some cooperation with the investigating agents until he employed counsel to represent him. He did not deliver to the agents upon request the book he kept for transactions with the farm tenants but had his representative read figures from it to the investigating agents. Petitioner made a statement under oath concerning his tax liability for the taxable years but declined to sign it. The investigation conducted by agents of respondent was completed in about 2 years, about one-half of which time was actually spent in the performance of work incident to the examination. The books of account and records maintained by petitioner were inadequate at all times important *241 to properly reflect his income. The deficiencies were determined on the basis of net worth of petitioner at the close of 1940 and each taxable year, and personal and living expenses. The net worth statement prepared by respondent after an exhaustive examination discloses assets and liabilities, at the close of the years shown as follows, cents omitted, to the difference in which he added personal and living expenses, and allowed deductions as shown, in arriving at net income: Personal
and living
Year
Assets
Liabilities
Increase
expenses
Deductions
1940
$ 50,593
$15,189
$ $ $
1941
75,415
20,507
19,503
2,500
250
1942
90,067
14,149
21,011
2,500
260
1943
94,411
20,089
1,596 [1]
3,000
310
1944
104,471
28,965
1,183
4,000
500
1945
152,522
33,026
43,990
5,000
2,156
1946
222,881
62,103
41,282
9,018
500
1947
219,571
48,586
10,206
9,782
500
1948
286,214
70,338
44,891
14,159
402
The assets included in the net worth statement consisted of cash, accounts receivable, securities, cotton and cattle inventories, livestock, an interest in the Ballard *242 Gin Company, farm lands, buildings and machinery, and other physical assets. The liabilities consisted of accounts and notes payable and reserves for depreciation. Included in the accounts receivable are the amounts of $25 in 1945, $487.68 in 1946, and $100 in 1947 as amounts due from Victor Williams and Lige Taylor, who were tenants on farms owned by petitioner's wife. The amounts were assets of petitioner's wife for advances made to the debtors. The cotton inventories included $23,135.65 at the close of 1945 and $266.43 at the close of 1948. Respondent did not include any amount for cotton on hand at the close of 1944. Petitioner obtained bank loans, secured by cotton, as follows, including the time of payment of each loan: Bales
of cotton
Date
securing
of loan
Amount
loan
Loan paid
Dec. 11, 1944
$ 9,000
97
Dec. 30, 1944
Dec. 14, 1945
13,660
121
July 18, 1946
Oct. 18, 1948
10,000
70
Dec. 8, 1948
Only the loan of $13,660 was included in the net worth statement as a liability and that was listed as outstanding at the close of 1945. The amount in the statement for automobiles at the close of 1948 included a *243 Dodge car which petitioner sold during that year. The cash in the Pickens Bank at the close of 1943 is understated in the net worth statement by the amount of $100. The cash in bank at the close of 1948 is overstated in the net worth statement by the amount of $10,000 and the liabilities for that year should include the amount of $5,181.44 for accounts payable. Petitioner had no records from which the cost of all of his farm machinery could be determined by the respondent. The amounts used for machinery on hand at the close of the years 1941 to 1945, inclusive, including machinery acquired in 1945 from the Ricks' estate, were in accordance with figures supplied by petitioner or cost set forth in petitioner's returns. The costs of acquisitions made in and after 1946 were obtained from the dealers from whom petitioner purchased the property. Petitioner placed a value of $6,910.99 on the machinery purchased from the Ricks' estate. The return filed by petitioner for each taxable year was false or fraudulent with intent to evade tax. A part of the deficiency for each taxable year is due to fraud with intent to evade tax. In 1950 petitioner executed consents extending to June 30, 1952, the *244 period of limitation for assessment for the years 1946 and 1947. In January 1952 the agents of respondent then engaged in investigating petitioner's returns for the taxable years informed petitioner that unless he executed consents extending the period of limitation for assessment of taxes for the years 1946, 1947, and 1948, to June 30, 1953, it would be necessary to protect the Government's interest by mailing a statutory notice of deficiencies in tax before completion of their investigation, and prior to the expiration of the period of limitation for those years. On January 16, 1952, petitioner voluntarily executed consents extending the period of limitation for assessment of income tax for the years 1946, 1947, and 1948, to June 30, 1953, even though his counsel recommended otherwise. The statutory notice of deficiency for the taxable years was mailed to the petitioner on October 16, 1952. Jeopardy assessments in the amount of the deficiencies were previously made on September 16, 1952. Petitioner did not file any declarations of estimated tax or pay estimated tax for the years 1943 to 1948, inclusive. Opinion Statute of limitations Petitioner alleges that assessment and *245 collection of the deficiencies are barred by the statute of limitations. He asserts that in no year was the statute tolled by the filing of a false or fraudulent return with intent to evade tax and that the waivers executed in 1952 to extend the 3-year period for assessment for 1946, 1947, and 1948 were obtained under duress and false pretenses and are ineffective. Respondent contends not only that a false or fraudulent return was filed for each year but that the returns filed for 1943 and 1945 were not returns required by section 51(c), I.R.C. of 1939, and, consequently, such returns did not start the running of the statute. He also contends that a part of the deficiency for each year was due to fraud with intent to evade tax. Respondent has the burden of proof on the fraud issue. The petitioner is not contesting the use of the net worth and expenditure method of determining his net income. Except in a few particulars, which will be discussed under the issue relating to the amount of the deficiency for each year, and several adjustments covered by stipulation, he agrees with the respondent's determination of his taxable net income. As a result he admits that the returns filed for *246 the taxable years grossly understated his taxable net income. Petitioner has a record of not filing returns or reporting taxable net income or operating losses for an extended period. Although engaged in various gainful activities, he filed no returns for the years 1931 to 1936, inclusive, and thereafter through 1940 filed returns showing no tax liability. In spite of such failure to return income subject to tax, petitioner had net worth, as computed by respondent, of $35,403.49 at the close of 1940, the accuracy of which is not being contested. No attempt is made by petitioner to explain his ability to accumulate such a large amount of net worth without incurring tax liability. He was declared a bankrupt in 1925 and, absent evidence to the contrary, it may be assumed that the accumulation occurred after that year. Petitioner's consistent record of failure to report tax liability prior to 1941 continued without interruption during the next 8 years, which are the taxable years before us. During that period petitioner reported losses and according to the net worth cash expenditure computation made by respondent in determining the deficiencies, he had net income as follows, cents *247 omitted: [2]
Taxable
Loss
net income
Under-
Year
reported
determined
statement
1941
$ 944
$ 21,753
$ 22,697
1942
2,730
23,251
25,981
1943
14,015
1,093
15,108
1944
24,196
4,683
28,879
1945
4,463
46,833
51,296
1946
12,306
49,800
62,106
1947
27,468
19,489
46,957
1948
24,985
58,648
83,633
Total
$111,107
$225,550
$336,657
The failure to report for taxation net income admittedly received is strong evidence of a fraudulent purpose, particularly in a case, such as we have here, where the amounts omitted were large and continuous. M. Rea Gano, 19 B.T.A. 518; John McKeon, 39 B.T.A. 813; Lillian Kilpatrick, 22 T.C. 446, affd. 227 Fed. (2d) 240; Eugene Vassallo, 23 T.C. 656; Rogers v. Commissioner, 111 Fed. (2d) 987. Apparently recognizing that well established rule, *248 petitioner concedes on brief that fraud may be inferred from the gross understatements of income here over a period of years in the absence of a reasonable explanation. Petitioner says that the discrepancy is adequately explained by the evidence. The substance of his contentions in that regard is that the long hours he devoted to the conduct of his activities required that he entrust to others the keeping of records and books adequate to reflect his taxable net income; that he was so lacking in knowledge of bookkeeping and income tax laws that he was not in a position to know at the end of any accounting period whether he had net income subject to tax; that he at all times maintained proper records, as distinguished from books, which he turned over to accountants for preparation of returns, and that he accepted, as correct, the returns prepared from such sources. It is clearly established by the evidence that petitioner did not at any time important maintain adequate books or other records to reflect his taxable net income within a reasonable degree of accuracy. Petitioner was fully aware of that deficiency in his business operations, yet did not take all of the steps necessary *249 to correct it. His concession on brief that his taxable net income was grossly understated infers that his accounting methods were wholly inadequate for tax purposes. While petitioner had no knowledge of accounting he was aware of the need for proper books and records and was tax conscious. He was careful to have most of his checks for expenditures bear a notation of the purpose for which drawn. These cancelled checks were placed in the hands of accountants for preparation of returns. Such procedure gave some assurance to him that all allowable deductions would be claimed as offsets to gross income. No such careful attention was given to items of gross income. To the contrary, they were handled in a way to mislead or conceal. See Spies v. United States, 317 U.S. 492. The large discrepancies between the losses reported in returns and admitted taxable net income are too great to be charged to normal errors of books and records or incompetent accountants. Petitioner otherwise seeks to account for the unusual situation by pointing out that he never had a large amount of cash on hand at the end of any year and that his liabilities increased from year to year. The education *250 and business experience of petitioner are opposed to the idea that he could have at any time measured the financial outcome of his affairs by the amount of cash he had on hand at the close of the year. Lack of large reserves of cash was due to his investments in property, largely physical. As petitioner's liabilities, consisting of accounts and notes payable, increased only about $28,000 from January 1, 1941, to the close of 1948, petitioner must be charged with knowledge that the acquisitions were made, except for that increase, from net income of his businesses. Petitioner, of course, knew that he was filing returns showing losses in business operations. He must be charged with knowledge that at the same time he was fully aware that his net worth was increasing by many thousands of dollars from the activities he represented in returns as being operated at great loss. That he was fully acquainted with his actual financial condition is definitely shown by the statements he signed in connection with applications for loans. It is inconceivable that he did not realize that his increases in net worth had never been reported for taxation. Further discussion of the evidence appears unnecessary. *251 We conclude from a consideration of all of the facts that the return filed for each taxable year was false or fraudulent with intent to evade tax. It follows that assessment of the deficiency determined each year is not barred by the statute of limitations. The conclusion just reached on the character of the returns renders unnecessary any consideration of the issue raised by petitioner that the waivers executed in January 1952 to extend the statutory period for assessment of deficiencies for the years 1946, 1947, and 1948 are ineffective because they were obtained under duress and false pretenses. Deficiencies As already mentioned, petitioner admitted the accuracy of respondent's determination of taxable net income except in certain specified particulars. Except for 11 classifications of expenditures in 1946, 1947, and 1948, petitioner is not contesting the determinations made by respondent of his personal and nondeductible expenses in each of the taxable years. On brief he limited his allegations of error to the payments made to the C. & C. Grocery and Murphy Tours and for the fishing trip, flowers, and football tickets. As to the expenses still in controversy, the evidence *252 is not, in our opinion, sufficient to overcome the presumptive correctness of the respondent's finding. Accordingly, his determination will not be adjusted. Excluding small amounts owed by Victor Williams and Lige Taylor, petitioner agrees with the determinations made by respondent of the accounts receivable held by him at the close of each taxable year. The evidence establishes that the controverted amounts actually represent obligations owed to petitioner's wife for advances made by her to tenants on farms she owned. The several amounts will be eliminated from the net worth statement in the recomputation under Rule 50. Petitioner is asking that depreciation be allowed on trucks and trailers based upon a useful life of 3 years for each class of property. Respondent made allowances at the rates consistently claimed in returns filed for the taxable years. The evidence offered by petitioner does not warrant the finding of a shorter life for the assets. Accordingly, the respondent's allowances will not be disturbed. The parties are in agreement on the cost basis of various farm machinery and equipment for depreciation allowances. The only question in issue is the useful life of *253 the assets. The petitioner claimed depreciation in his returns for 1942, 1943, 1944, 1946, and 1947 based upon usefulness over a period ranging from 2 to 10 years, depending upon the character of the property. No depreciation was claimed in the return for 1941 and no schedule supported the deductions claimed in returns filed for 1945 and 1948. Respondent made allowances for exhaustion substantially in accordance with the useful periods claimed by petitioner in his returns. Petitioner contends on brief that the rate of depreciation on each item of property should be 25 per cent to reflect his and his farm manager's testimony that horsedrawn equipment had a useful life of from 6 to 8 years, and that machinery and mechanical equipment never lasted longer than from 2 to 4 years. Neither witness testified as to all of the assets, or specifically so testified. The manager made a distinction between the life of mule-drawn and mechanical-drawn equipment, without specifying how it was employed. Petitioner made no such distinction. They testified to a longer life for some of the property than the respondent determined and a shorter life for other assets. Some equipment on hand as early as *254 at the beginning of 1941 is still in use. The evidence offered by petitioner does not justify allowances for depreciation on the assets in excess of the amounts allowed by the respondent. Except for the ownership of a Dodge at the close of 1948, [3] the only difference between the parties on the issue involving depreciation on automobiles is the rate to apply. The respondent allowed depreciation at the rate of 20 per cent a year and petitioner is claiming that the assets had a useful life of no longer than 3 years. We conclude from a consideration of the evidence that the automobiles had a useful life of 4 years. Petitioner contends that his net worth at the close of 1943 should be decreased by $1,100 because of the failure of respondent to allocate that amount of the purchase price of the Barnett tract to accounts receivable. The effect of his argument is that we reduce the amount for land without an offsetting increase in the accounts receivable determined by respondent, on the theory that the amount of *255 receivables may not be disturbed under the facts, as stipulated. The stipulation on the "Farm" receivables held by petitioner must be read in connection with a prior stipulation, in which petitioner expressly reserved the right to offer evidence on the allocation of costs of certain specified farms, including the Barnett tract, "between land, accounts receivable, and improvements". So reading the stipulations, any decrease of cost of land of the Barnett tract in the net worth statement would require a corresponding upward adjustment of the accounts receivable, without tax benefit to petitioner. Under the circumstances, adjustment would be useless procedure for tax purposes. The respondent alleged in his answer to the amended petition and amendment to answer that he was unable to determine petitioner's inventory of cotton each year; that at the close of 1944, 1945, and 1948, petitioner owed banks $9,000, $13,660, and $10,000, respectively, secured by cotton, and that while the indebtedness was reflected in the net worth statement, the cotton securing the debts was not included as assets. He requested that the total assets be increased for the cotton in amounts equal to the outstanding *256 debts, and claimed increased deficiencies that would result from the upward adjustment of net income reflected in the net worth statement. Respondent had the burden of proof under the issue raised by him. The parties stipulated the miscellaneous assets, including cotton, owned by petitioner at the close of each taxable year, subject only to a right in favor of petitioner to introduce other evidence on the cotton held by him. Bank records, introduced by petitioner to establish borrowings from banks, show that each of the amounts borrowed in 1944 and 1948 was paid in the year the loan was negotiated, and is not reflected as a liability of petitioner in the net worth statement. Accordingly, there is no factual basis for inclusion of such assets on the grounds relied upon by respondent. The other debt, created in 1945 in the amount of $13,660, was outstanding, and is reflected in the net worth statement as a liability at the close of that year. Respondent stipulated that petitioner had a cotton inventory of $23,135.65 on December 31, 1945. Respondent points to no evidence establishing that the cotton on which the bank had a lien for its loan is not included in the amount of inventory *257 as determined by him and agreed to by the parties in the stipulation of facts. On this issue we hold for the petitioner. In preparing the net worth statement respondent allowed an amount each year for depreciation on improvements on petitioner's farms. Petitioner reserved a right in the stipulation of facts to offer evidence to show error in respondent's allocation of cost to improvements on 3 tracts and he introduced some testimony under the reservation. On brief petitioner does not request any findings of fact from the evidence or discuss the issues. Accordingly, we assume that he has abandoned his allegations of error. Finally, petitioner contends that the net worth statement reflects a small amount each year for cash in bank representing proceeds of sales of cotton produced on farms owned by his wife, all of which, he says, was reported by her in separate returns. Petitioner testified that the proceeds were deposited in a joint bank account with his wife, where they remained. The effect of such testimony is that the amounts were in the account at the close of the year. But petitioner further testified that the deposits were used to pay taxes and other debts, to what extent *258 not being shown. Thus no proof was made that any of the proceeds were in the account at the close of each year for inclusion as an asset of petitioner. Furthermore, aside from the amounts reported by the wife, no evidence was offered to establish the amounts deposited in the account belonging to the wife. Without proof that the net worth statement includes those amounts, no adjustments will be made. Fraud penalties Reflection of our adjustments to the net worth statements will leave a deficiency for each year. All or some part of the deficiency for each taxable year resulted from understatements of taxable net income in false or fraudulent returns filed with intent to evade tax. Accordingly, we find that fraud penalties were properly imposed. Penalties for failure to file declarations of estimated tax and underestimations of estimated tax for the years 1943 to 1948, inclusive. Petitioner seeks to avoid the penalty imposed by section 294(d)(1)(A) for not filing declarations of estimated tax on the ground that his failure was due to reasonable cause and not to willful neglect. He does not deny that declarations should have been filed. The contention is made that he relied upon *259 "supposedly competent advisers" to file the returns and that he disclosed to them all of the facts necessary to determine the need for filing the declarations. The individuals whose advice was allegedly sought were Patton and Jorgensen. Reliance on others for advice may serve as protection against the penalty if it is shown that the accountants were "qualified to advise or represent the taxpayer in the premises", Rene R. Bouche, 18 T.C. 144, and that they were furnished with sufficient information "to enable him to come to an intelligent conclusion", Tarbox Corporation, 6 T.C. 35. The grounds relied upon inferentially admit that the advisers were not qualified to give him proper advice in the matter. The income tax returns of petitioner for 1943 to 1946, inclusive, were prepared by Patton. Patton testified that she was employed by petitioner for full time services to, among other things, "prepare returns and submit them to the Government". She was hired in April 1943, which was before the passage of the Current Tax Payment Act of 1943, requiring for the first time the filing of declarations of estimated tax. It does not appear that Jorgensen was engaged *260 to prepare returns other than income tax returns for 1947 and 1948. No contention is made that petitioner ever specifically requested Patton or Jorgensen to advise him on the need to file declarations of estimated tax, or that they ever advised him in the matter. The accountants being familiar with the volume of his business, they must have known that there was ample ground for concluding that petitioner would have $600 or more of gross income each year. See section 58(a)(2). Patton and Jorgensen testified at the hearing but petitioner did not question them on the consideration they gave, if any, to the filing of declarations of estimated tax, and if they did, and advised the petitioner, the nature of their advice. Petitioner also appeared as a witness at the hearing but did not testify that he expected his gross income each year to be less than $600. It is inconceivable under the facts here that he could have reasonably expected his gross income would not be in excess of that amount. Any ignorance of the statutory requirement would not relieve him of the penalty. Howard M. Fischer, 25 T.C. 102 (10/26/55). Absent proof that the falure to file declarations of estimated *261 tax was due to reasonable cause and not to willful neglect, the action of respondent in imposing the penalties for the failure is sustained. Petitioner having failed to file declarations of estimated tax, there were substantial underestimations of estimated tax within the meaning of section 294(d)(2). G. E. Fuller, 20 T.C. 308; H. R. Smith, 20 T.C. 663; Harry Hartley, 23 T.C. 353. It follows that the penalties were properly imposed under that subsection. Statute of limitations and penalties for 1943 and 1945 under section 291(a). Respondent alleged in an amended answer that the papers filed by petitioner as income tax returns for 1943 and 1945 were not proper returns under section 51(c) to start the running of the statute of limitations and, therefore, [he] had an unlimited time within which to make assessments of deficiencies for those years. The issue thus raised was made moot by our conclusion that the returns were false or fraudulent with intent to evade tax. By the same answer and for a like reason respondent claimed increased deficiencies to reflect penalties authorized by section 291(a) for failure to file a return required by *262 chapter I "unless it is shown that such failure is due to reasonable cause and not due to willful neglect." Respondent had the burden of proof under the issue. Section 51(c) provides that "If the taxpayer is unable to make his own return, the return shall be made by a duly authorized agent. * * *" There was at least substantial compliance here with the statute. Petitioner was away from Jackson and out of the state when it was necessary to file the returns to avoid penalty for untimely filing. Faced with that condition, Patton, who had prepared the returns, communicated with petitioner by telephone and received his authority to sign his name to them, which she did, and until the hearing herein respondent accepted the returns as meeting all of the requirements of the statute. There is no evidence to indicate that petitioner has not at all times recognized the returns as his own. The penalty may not be imposed here without proof by respondent of lack of reasonable cause, and willful neglect. Such proof has not been made. So concluding, we find for the petitioner on this issue. Decision will be entered under Rule 50. Footnotes
1. The account was kept in the name of Tom Riddell Community Sales. It was opened August 25, 1942, and closed January 30, 1946. The ledger sheets of the bank prior to February 7, 1943, were destroyed by the bank.↩
2. The name of the account was changed on January 1, 1942, to Tom Riddell Community Sales. It was opened in 1940 and closed May 24, 1943.↩
3. Account was opened October 15, 1943, and closed May 29, 1945.↩
4. This account was opened June 12, 1948, and was not closed until 1952.↩
5. Name changed to Mr. and Mrs. T. H. Riddell October 12, 1948. The account was opened prior to November 30, 1940, and continued after the close of 1948.↩
6. The name of the account was changed on January 16, 1942, to Tom Riddell Community Sales. The account was used for business conducted at the barn in Jackson.↩
1. Amounts shown are the cost price of the property.↩
1. Costs not shown. Depreciation of $700 was claimed on an automobile based upon 3 1/2 cents a mile for 20,000 miles. No schedule was attached to the return to substantiate the depreciation claimed. ↩
2. No schedule was attached to support the claim.↩
1. Except in a few instances, the total amount each year consisted of amounts ranging from about one dollar to ten dollars. ↩
2. The tours were conducted by train to advertise the State of Mississippi. The amount was spent for a pleasure trip for petitioner's wife and daughter. ↩
3. Some indeterminable portion of the amount was spent for hats and shirts presented to buyers at petitioner's barns. ↩
4. An indeterminable portion of the amount was spent on a fishing trip with buyers at his barns and the remainder for a Murphy tour, on which petitioner was accompanied by his wife and daughter. ↩
5. The flowers were used as an expression of sympathy on account of death of individuals who had some connection with him in the livestock business. ↩
6. Two of the tickets were given to customers of petitioner and others were used by himself and members of his family. The remainder was given to "numerous boys." ↩
7. The amount represents the total of contributions made by petitioner towards the construction and equipment of a consultation room at a church.↩
1. A 1942 Chevrolet truck acquired in 1948 was depreciated by respondent based on a life of 2 years.↩
1. Decrease.↩
2. The parties stipulated that cash in bank at the close of 1948 was overstated in the statement in the amount of $10,000, and accounts payable were understated $5,181.44. Other adjustments, minor in amount, will be required by our conclusions under the issues.↩
3. We concluded that the car was sold by petitioner during the latter part of 1948 and therefore should be excluded from the assets owned by him at the close of that year.↩